# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:20-cr-187 |
|  | ) |  |
|  | ) |  |
| PLAINTIFF, | ) | CHIEF JUDGE SARA LIOI |
|  | ) |  |
| vs. | ) |  |
|  | ) | MEMORANDUM OPINION |
|  | ) | AND ORDER |
| RICHARD EBY, | ) |  |
|  | ) |  |
|  | ) |  |
| DEFENDANT. | ) |  |

Before the Court is the amended motion of the defendant, Richard Eby ("Eby"), for a new trial pursuant to Federal Rule of Criminal Procedure 33. (*See* Doc No. 87 (Motion and Memorandum in Support).) The plaintiff, United States of America (the "government"), opposes the motion. (Doc. No. 90 (Opposition).) Eby filed a supplement to the amended motion (Doc. No. 88 (Supplement)) and a reply. (Doc. No. 92 (Reply).) On July 24, 2024, the Court conducted an evidentiary hearing on the motion, and, at the conclusion of the hearing, the Court took the matter under advisement. The motion is now fully ripe and ready for resolution.

## I.      BACKGROUND

In 2015, FBI Special Agent Adam Christensen ("Agent Christensen") began investigating criminal activity involving the sexual exploitation of underaged girls on the social media platform chateen.com ("Chateen"). Specifically, his investigation revealed that groups of individuals would work collectively to recruit minors from other social media websites to come to virtual chatrooms on Chateen, where they would be encouraged to undress and engage in sexual activity for the

gratification of members of the group. At trial, Agent Christensen testified that each member of such a group had a different role. One individual would serve as a "hunter" and was responsible for identifying potential victims and encouraging them to visit a chatroom on Chateen that was controlled by the group. If the victim needed encouragement to follow the "hunter," a "looper" would play a pre-recorded video depicting a minor boy or girl to convince the victim that she was interacting with another minor when, in fact, she was communicating with a grown man. Once inside the designated chatroom, a "talker' would take over, and this person's goal was to convince the victim to undress and engage in sexual activity on camera. Finally, a "watcher" would provide security for the group to shield its activities from authorities and other individuals, such as "lurkers,"[1] using the website.

Early in his investigation, Agent Christensen was able to assume the online persona of an informant—Virgil Napier, Jr.—who was a member of such a group and was cooperating with authorities. Over the course of three weeks, Agent Christensen posed as Napier and was able to identify IP addresses and usernames associated with individuals, and groups of individuals, who were exploiting minors and generating child pornography on Chateen. One such group identified by Agent Christensen was a group he named the "chats" group. Agent Christensen subpoenaed the internet providers affiliated with this group and discovered that the IP addresses for username "perp6969" belonged to Eby, which confirmed that he was a participating member of the group.

On June 25, 2019, Eby was apprehended at Fort Lauderdale International Airport. Officials from United States Customs and Border Patrol ("CBP") detained and interviewed Eby. In this

---

[1] At trial, Agent Christensen testified that a lurker was someone who gains access to the chatroom but does not assist the group or advance its goals.

interview, Eby told CBP officials that he used the username "perp6969" on several websites. CBP detained Eby's laptop, cellphone, and SD card upon conclusion of the interview. These devices were sent to Agent Christensen for analysis.

Agent Christensen initially used the software program Internet Evidence Finder ("IEF") to analyze the data from Eby's devices and identify "artifacts" that might be of interest in the investigation. During his review of these artifacts, Agent Christensen "tagged" (or bookmarked) certain artifacts that he believed were particularly relevant to the investigation. The tags were used to quickly identify and reference the specific marked artifacts amidst the entire report. A portable case file containing the report generated by IEF and the tags placed by Agent Christensen—minus the evidence that was considered contraband and could only be viewed at an FBI field office—was created for each device and placed on a USB drive that was provided early on to Eby and all defense counsel in a related case with multiple defendants[2].

As the present case progressed toward trial, Agent Christensen used a newer software program, known as Axiom, to reprocess the raw data contained on Eby's devices, including his laptop. Like IEF, Axiom also generated a report with artifacts for review.[3] During his review of the artifacts from Eby's laptop, Agent Christen "tagged" approximately 17,703 artifacts. While the Axiom portable case file ultimately prepared by Agent Christensen was sanitized to exclude contraband, it contained his tags, which were further organized into labeled sub-folders based on

---

[2] Eby had a series of different attorneys appointed to represent him. His latest counsel obtained the USB drive from prior counsel.

[3] At the hearing, Agent Christensen testified that, after Axiom was released, he tended to favor it over other programs such as IEF because it permitted a "deeper dive" into the raw data and allowed for a more thorough review. Defendant's expert, Mr. Curtin, testified that he was familiar with Axiom, which was created by the same provider that released IEF, but that as a matter of preference he tends to use IEF to analyze raw data.

content so that the examiner could easily restrict his review to certain subject matters, such as those pertaining to Chateen or Perp6969.

Over a four-day period—between February 14, 2023 and February 17, 2023—defendant's expert, Matthew Curtin, was permitted to inspect all of the images, videos, and other extractions from Eby's electronic devices, including those that Agent Christensen tagged from the Axiom Report (and the Axiom Report, itself) as particularly relevant, at the FBI's field office located in Ann Arbor, Michigan. (Doc. No. 87-2 (Curtin Declaration) ¶ 5.) In preparation for Mr. Curtin's visit, Agent Christensen prepared a drive containing several folders, including: (1) a folder labeled "Analyze Reports," which contained the analysis of the images and videos; (2) a folder named "Cellebrite Extraction," which contained the reports from the various cell phones; (3) a folder designated "Forensic Images," which housed all of the forensic images of the laptops and external storage devices; (4) a folder labeled "Discovery USB," which contained all of the electronic discovery that had previously been produced to defense counsel; and (5) a folder labeled "Portable Case File," which contained the portable case files of all of the reports generated on the electronic devices seized in the investigation. (Gov. Ex. 1 (Screenshot of the Drive Folders).) Included in the Portable Case File folder was the Axiom portable case file prepared for Eby's laptop that contained the afore-mentioned tagged artifacts. (*See* Gov. Ex. 1; Gov. Ex. 2 (Paths to Reports to Eby's Devices); Gov. Ex. 3 (Portable Case File); *see also* Doc. No. 79, at 959–60.) There is no dispute, therefore, that the Axiom Report (the Axiom portable case file) of Eby's laptop was made available to Mr. Curtin and the defense team, at the latest, by February 14, 2023, more than 11 months before trial.

Additionally before Mr. Curtain began his review, Agent Christensen went over the files

on the drive, providing Mr. Curtin with a roadmap of the materials to which he was given access. Relevant to the present motion, Agent Christensen explained to Mr. Curtin what the term "portable case" meant to him; namely, that it did not contain contraband and could be removed from FBI possession. Mr. Curtin testified that he did not remember reviewing the Portable Case File folder during his inspection,[4] though he did not dispute that he had access to it.[5] He explained that he was concerned primarily with the contraband that he could not download and take with him. He further testified that the scope of his review was informed by certain questions posed by Mr. Eby and his counsel during their discussions of the case. Before leaving Ann Arbor, Mr. Curtin prepared and downloaded onto his own laptop the Discovery USB File from the agent's prepared drive. He testified that he only downloaded the Discovery USB File because it was the only file he specifically remembered Agent Christensen telling him did not contain contraband. He did not remember if he was told by Agent Christensen whether the Axiom portable case file (or any other file) contained contraband, but he acknowledged that he did not ask and did not attempt to download any other files or take them with him.[6]

Mr. Curtin conceded that the government did not place any time constraints on his review

---

[4] The Court found Mr. Curtin's hearing testimony largely incredible, and it was clear that he employed obfuscation on the witness stand in an attempt to cloud the issues under consideration. He was evasive and he repeatedly failed to provide answers to the questions posed on cross-examination and by the Court. He also qualified or hedged most, if not all, of his answers and conveniently failed to recall many of the details from his own expert review of the evidence in this case.

[5] At the hearing, Mr. Curtin conceded that—had he reviewed the Axiom portable case file—he could have used the drop-down menu to show all of the tags that were organized into sub-folders labeled by category. (*See* Gov. Ex. 4 (Axiom Dashboard); Gov. Ex. 5 (Artifacts Pane).)

[6] Consistent with his understanding of a "portable case," Agent Christensen testified that the Portable Case File folder did not contain any contraband. He further testified that he did not prevent Mr. Curtain from downloading the contents of the Portable Case File folder or any other files. In fact, he expected Mr. Curtain to take the entire Portable Case File with him. He also explained to Mr. Curtin what to do if he subsequently discovered that he had inadvertently downloaded contraband. Mr. Curtin's suggestion that he did not download the Axiom portable case because Agent Christensen did not specifically present it to him rings hollow.

of the discovery (which included the forensic reports), and he acknowledged that Agent Christensen was extremely cooperative and helpful. He admitted that he was not prevented from seeing any files he wished to view, and he actually viewed every file he wanted to see. Agent Christensen agreed that Mr. Curtin could have taken as long as wished to review the materials, and that he was free to download any material that did not include contraband, including the Axiom portable case file and the tags contained therein.[7] Even after Mr. Curtin returned to his office and was able to review the materials he had downloaded in his own lab, no one from the defense team requested additional time for Mr. Curtin to review any of the materials that had previously been made available to him.

In a letter dated January 11, 2024, the government sent Eby's counsel a notice, pursuant to Fed. R. Crim. P. 16(a)(1)(G), identifying in detail twelve areas in which Agent Christensen was expected to offer trial testimony. (Doc. No. 87-1 (Notice).) Given Agent Christensen's lead role in the underlying criminal investigation, many of the areas identified did not contain expert testimony or expert opinion, but, instead, were summaries of possible fact testimony. Accordingly, the notice provided that "[w]hile the items described below likely do not qualify as expert or opinion testimony, this notice is provided in an abundance of caution." (*Id*. at 1.) The notice also reminded defense counsel that "[y]ou have had access to Agent Christensen's reports and have also been privy to his opinions about the operation of the chatrooms on Chateen, but this notice serves to memorialize the previously disclosed information." (*Id*.) In his motion, Eby denies that the information was previously disclosed, but the hearing clearly established that it was, in fact,

---

[7] In contrast to Mr. Curtin's testimony, the Court found Agent Christensen to be credible, and it was clear that he was transparent in his dealings with counsel in this case and with Mr. Curtin regarding the evidence that was made available to the defense, including the Axiom portable case file, which he testified constituted his expert report in this case.

made available to Eby.

The case proceeded to trial, beginning on January 22, 2024. During the course of the five-day trial, the jury heard testimony from Myron Brown and Steven Foster, both of whom were charged in a separate, related case for their involvement in the "chats" group;[8] several minor victims; and Agent Christensen, whose testimony spanned most, if not all, of the subject areas identified in the government's January 11, 2024 letter notice to defense counsel. Over two days, Agent Christensen testified regarding his own educational background and training; the nature and scope of his undercover Chateen investigation; and the results of his investigation, including the activities of Eby and other members of the "chats" group on Chateen.

Agent Christensen also testified to the results of his forensic examination of Eby's laptop and the examples of child sexual abuse materials found therein. This evidence was introduced through Exhibits 62 and 63, which contained exports from the relevant Axiom portable case file displaying a selected number of artifacts—8 tags in Exhibit 62 and 78 tags in Exhibit 63—that Agent Christensen had previously tagged as showing an interest in minors. Defense counsel objected to these exhibits, arguing that they constituted expert reports that were not properly disclosed pursuant to Rule 16(a)(1)(G). The government responded that the exhibits were not themselves reports, but rather were summary exhibits containing exports from the Axiom portable case file made accessible to Eby's expert more than 11 months before trial, a fact that defense counsel conceded during the sidebar discussion of his objection. (Doc. No. 80, at 16 (Mr. Bryan:

---

[8] On March 12, 2020, six other individuals, including Brown and Foster, were indicted in federal court and charged with crimes associated with their involvement with the "chats" group. (N.D. Ohio Case No. 1:20-cr-186, Doc. No. 1 (Indictment).) Because he was out of the country, Eby was not charged in this initial case, but was, instead, charged separately in the present related case, and the indictment in this case was unsealed at the time of Eby's arrest. All six individuals charged in Case No. 1:20-cr-186 entered guilty pleas prior to Eby's trial.

"We're not disputing that fact, Your Honor. Our expert had access to this information.") At the conclusion of the sidebar conference, the Court overruled the objection, finding that the exhibits were demonstrative or summary exhibits organized in a particular fashion to present raw information that had been previously made available to the defense. (*Id*. at 17–19.)

During their deliberations, the Court received two questions from the jury.[9] The first question—which is pertinent to the present motion for a new trial—asked, "Were any of the images or videos found on Eby's computer of the minor victims?" (Doc. No. 72 (First Jury Question), at 1.)[10] The Court proposed to counsel that this initial question be answered by instructing the jury to rely on their own recollection. (Doc. No. 88, at 1.) Defense counsel objected to this instruction, and instead requested that the jury be instructed that there was no evidence that the images found on Mr. Eby's computer were of the minor victims. (*Id*.) The government objected to this alternative instruction because the individuals in the images could not be identified one way or the other, given that the images displayed various body parts and not faces. (*Id*.) The Court then offered defense counsel the following options: (1) instruct the jury to rely on their own memory (as originally proposed by the Court); or (2) instruct the jury that there was no evidence on defendant's computer that the images were or were not of the minor victims. (*Id*.) Defense counsel rejected both options, again advocating for the instruction advising the jury that there were no images of

---

[9] Much of the Court's discussions with counsel regarding the jury questions occurred off the record. When the Court reviewed defendant's amended motion, it realized that defendant omitted and/or misrepresented several of the events at trial, including the discussions regarding the jury questions. Thereafter, the Court held a telephonic conference with all counsel wherein it instructed defense counsel to file a supplement that accurately reflected all of the off-the-record discussions regarding the jury's first question, including the Court's initial proposal to counsel. (Minutes of Proceedings [non-document], 4/18/2024; *see* Doc. No. 88 (Supplement).) Because counsel's supplement also was incomplete, the Court further clarified the nature of these conversations on the record during the motion hearing.

[10] Though not necessarily relevant to Eby's motion, the second question was: "Is Count 2 exclusive to MV4 [minor victim No. 4]?" (Doc. No. 72-1 (Second Jury Question), at 1; *see* Doc. No. 81, at 14.) Without objection from either side, the Court instructed the jury: "Yes, Count 2 relates only to MV-4." (Doc. No. 72-1, at 2; *see* Doc. No. 81, at 14.)

the minor victims on Eby's devices. (*Id*.) Nevertheless, defense counsel indicated that if he had to choose between the first instruction proposed by the Court (rely upon collective memory) and the second one (no evidence that images were or were not the minor victims), he would opt for the second one. Accordingly, the Court instructed as follows: "Jurors: there was no evidence on Eby's computer (Exs. 44 and 51) that the images were or were not the minor victims." (Doc. No. 72, at 2; *see* Doc. No. 81 (Trial Transcript), at 12.)

The jury ultimately returned guilty verdicts as to Count 1 (conspiracy to engage in sexual exploitation of children), Count 3 (conspiracy to receive visual depictions of minors engaged in sexually explicit conduct), and Count 4 (conspiracy to access with intent to view child pornography), and returned a not guilty verdict on Count 2 (sexual exploitation of children). (Doc. No. 71 (Jury Verdicts).) Sentencing is set for August 1, 2024.

## II.    STANDARD OF REVIEW

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires.'" *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting Fed. R. Crim. P. 33(a)). "The rule does not define 'interest of justice' and the courts have had little success in trying to generalize its meaning." *Id*. (internal quotation marks and citation omitted). It is, however, "widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *Id*. (citation omitted). Any legal error that is significant enough to require reversal on appeal is an adequate ground for granting a new trial. *See id.* (quoting with approval *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)); *see United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (new trial may be warranted when "the substantial

rights of the defendant have been jeopardized by errors or omissions during trial"). However, any error that is considered harmless under Fed. R. Crim. P. 52 will not warrant a new trial. *See* 3 Charles Alan Wright & Sarah N. Whelling, *Federal Practice and Procedure* § 581 (4th ed. 2011) (citing, among authority, *United States v. Wilkerson*, 251 F.3d 273, 280 (1st Cir. 2001)).

"[T]he defendant bears the burden of proof that a new trial is warranted and 'such motions should be granted sparingly and with caution.'" *United States v. Dolan*, 134 F.3d 372, at *3 (6th Cir. 1997) (quoting *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993)). The decision of whether a new trial should be granted rests within the district court's sound discretion. *United States v. Wheaton*, 426 F. Supp. 2d 666, 669 (N.D. Ohio 2006) (citing *United States v. Hoffa*, 382 F.2d 856, 862 (6th Cir. 1967)); *see United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991) (citation omitted).

In his motion, Eby argues that the government breached its discovery obligations by providing an insufficient expert notice under Fed. R. Crim. P. 16(a)(1)(G) and by failing to disclose expert reports under Rule 16(a)(1)(E). (Doc. No. 87, at 2–8.) He also argues that the government failed to exchange Exhibits 62 and 63 with defense counsel in accordance with the Court's trial order. (*Id*. at 7–8.) Additionally, he claims that the Court usurped the jury's role when it instructed the jury that there was no evidence that the images found on Eby's computer were or were not images of the minor victims in this case. (*Id*. at 8–10.) Because his objections are without merit, and, therefore, do not demonstrate the existence of a substantial legal error, there is no basis upon which to grant a new trial.

### III.    DISCUSSION

#### A.  The Government did not Violate Rule 16(a)(1)(G) or Otherwise Offer Improper Expert Testimony and Exhibits

##### *1.  Fed. R. Civ. P. 16(a)(1)(G)*

Rule 16(a)(1)(G) requires, in part, that upon the defendant's request, the government must provide a written summary of any testimony the government intends to offer under Federal Rule of Evidence 702 in its case-in-chief at trial. Fed. R. Crim. P. 16(a)(1)(G). This disclosure must include: (a) "a complete statement of all opinions that the government will elicit from the witness;" (b) "the bases and reasons for them;" (c) the witnesses qualifications; and (d) "a list of all other cases" in which the witness has offered expert testimony in the last four years. Fed. R. Crim. P. 16(a)(1)(G)(iii). The rule exempts lay or fact testimony from its requirements. Expert opinion testimony, to which the Rule applies, is defined as testimony based upon "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702.

The Advisory Notes to Rule 16 provide that the disclosure required by Rule 16 is designed "to minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 Advisory Committee's Note (1993). To that end, the summary contemplated under the rule "should inform the requesting party whether the expert will be providing only background information on a particular issue or whether the witness will actually offer an opinion." *Id*. The summary of bases for the expert's opinion must be provided even when the proffered experts prepared no reports, and it can include "any information that might be recognized as a legitimate basis for an opinion under Federal Rules of Evidence 703[.]" *Id*.

Eby complains that the government's January 11, 2024, disclosure letter described Agent

Christensen's anticipated testimony only in the broadest possible terms and did not contain a complete statement of all opinions and the bases and reasons for the opinions that Agent Christensen intended to offer at trial. (Doc. No. 87, at 5–6.) In his motion, he identifies four bullet point areas and observes that they are devoid of any expert opinions. (*See id*. at 5.) In response, the government argues that Agent Christensen's testimony most likely did not qualify as expert testimony, but even if it did, the requirements of Rule 16 were met. (Doc. No. 90, at 5.) Rather, according to the government, Agent Christensen conducted an undercover investigation of Chateen, whereby he gathered evidence and utilized forensic tools to analyze the digital evidence. (*Id*.) At trial, he testified to the results of his investigation and the forensic examinations. As the disclosure letter indicates, the government provided the disclosure out of an abundance of caution, and now insists that it accurately captured the anticipated nature of the agent's testimony while satisfying Rule 16(a)(1)(G). (*Id*. at 7–10.)

Agent Christensen's trial testimony highlights the challenges a court faces when a witness "with specialized or technical knowledge was also personally involved in the factual underpinnings of the case." *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (citations omitted). There is no question that much of Agent Christensen's trial testimony involved his personal knowledge of the facts relevant to the case from his undercover involvement in the investigation via his online impersonation of Napier and his observation of the activities of Eby and the other members of the "chats" group. At least half of the subject areas identified in the disclosure relate to Agent Christensen's personal knowledge and involved no technical skill or expertise. For example, one such bullet point provided that Agent Christenson would testify to:

> The operation of different groups on Chateen and the roles assumed by group members, including[] hunters, talkers, loopers, watchers. (Based on undercover

presence on Chateen and investigation.)

(Doc. No. 87-1, at 2.) Because this and several other bullet points[11] in the disclosure involved Agent Christensen's personal knowledge of the case from his undercover investigation, the testimony they described "fits squarely within the proper bounds of Rule 701" of the Federal Rules of Evidence and was not subject to the disclosure requirements of Fed. R. Crim. P. 16(a)(1)(G). *See White*, 492 F.3d at 403 (deficient Rule 16(a)(1)(G) expert disclosure did not serve to bar witness' lay fact-based testimony).

The remaining bullet points identified in the disclosure represented either areas of testimony that would likely "provid[e] only background information on a particular issue" and were not expected to yield any expert opinions,[12] *see* Fed. R. Crim. P. 16 Advisory Committee's Notes (1993), or forensic analyses of the contents of Eby's electronic devices—including the location of child pornography on these devices—and the sever logs from Chateen. While the government concedes that any testimony Agent Christensen gave relating to his forensic analysis of various digital media and electronic devices was "partially based on his specialized knowledge of digital software[,]" it insists that Agent Christensen "merely presented the results of the software application he used, which did not involve an expert opinion on his part." (Doc. No. 90, at 6.)

---

[11] The disclosure provided that other fact areas Agent Christensen would likely address included: the background of the Chateen investigation, including the sessions on Chateen and the information regarding defendants and others using Chateen; "the requirements of belonging to these particular groups on Chateen, including the need to actively participate in the exploitation of children, and the consequence of being kicked out/or banned for lack of participation. (Based on undercover presence on Chateen and investigation)"; "[t]he pen register/tap and trace data obtained by the government on the defendants' internet usage through their internet providers. (Based on the investigation.)"; and "[t]he interviews and search warrants conducted by SA Christensen of the defendants. (Based on personal knowledge and the investigation.)." (*Id*.)

[12] As an example of a background area of testimony identified in the disclosure, the disclosure provided that Agent Christensen would likely testify to: "[t]he image and video operations on computers and computer media and how media programs[] create, store, and trade those files, including through cataloging processes on the computer. (Based on training and experience)." (*Id*.)

The Sixth Circuit addressed a similar argument in *United States v. Garnier*, 468 F.3d 920 (6th Cir. 2006). In *Garnier*, the government took an interlocutory appeal from the trial court's decision to exclude the testimony of an agent who had conducted forensic analyses of various computers because the government had not provided a written summary as required by Rule 16(a)(1)(G). On appeal, the government argued that the testimony did not constitute expert testimony because the agent simply ran "commercially-available software, obtain[ed] results, and recit[ed] them." *Garnier*, 468 F.3d at 925. The program in question generated a report containing "a heading, a string of words and symbols, date and time, and a list of words." *Id*. at 926. The court of appeals found that the interpretation of these reports would require the agent "to apply knowledge and familiarity with computers and the particular forensic software well beyond that of the average layperson." *Id*. Because the agent's testimony would involve "scientific, technical, or other specialized knowledge" under Rule 702, the Sixth Circuit held that the government should have provided a summary under Rule 16(a)(1)(G). (*Id*. at 926–27.) Nevertheless, the court ruled that the testimony should not be excluded because the government gave defendant a copy of the underlying computer evidence approximately a year before the case went to trial and a copy of the forensic software reports immediately after they were produced. Access to this underlying evidence, the court found, reduced any potential prejudice from the failure to provide a written summary. *Id*. at 927–28.

Like the agent in *Garnier*, Agent Christensen's use of specialized computer software, such as Axiom, and the analysis of the reports generated by such software arguably required him "to apply knowledge and familiarity with computers and the particular forensic software well beyond that of the average layperson" for which a Rule 16(a)(1)(G) disclosure was required. *Id.* at 926.

But also like in *Garnier*, the government in this case made the underlying computer reports available to the defense team well before trial, which would have ameliorated any prejudice to Eby had the government failed to provide a Rule 16(a)(1)(G) notice.

And yet, significantly, *unlike* the government's counsel in *Garnier*, the government in this case also provided Eby with a pretrial summary of Agent Christensen's expected expert testimony. In addition to describing at length the areas in which Agent Christensen would testify, including the results of his forensic examination of Eby's computers and the existence of child pornography thereon, the summary letter detailed the agent's educational background, training, and the cases in which he had offered similar testimony. Further, as previously noted, the underlying forensic reports, which included Agent Christensen's tags, were made available to Eby's expert well in advance of trial. Similar disclosures have been found to satisfy Rule 16(a)(1)(G). *See, e.g., United States v. Moran*, 771 F. App'x 594, 601 (6th Cir. 2019) (finding sufficient under Rule 16(a)(1)(G) the government's disclosure that provided generally that its computer expert would testify to the contents of his forensic report and included the witness' CV, where the report and the expert had been made available to defendant prior trial). Given the sufficiency of the disclosure, and the lack of any resulting prejudice, Eby has failed to demonstrate that the government's expert disclosure violated Rule 16(a)(1)(G) or otherwise resulted in a substantial legal error.

### 2. *Exhibits 62 and 63*

In a related argument, Eby posits that Exhibits 62 and 63, which contained exported portions of the Axiom portable case file from Eby's computer that were organized in a particular fashion for presentation at trial, should have been separately disclosed to him prior to trial. (Doc. No. 87, at 6–7.) Eby attempts to recast these summaries as expert reports because they contained

a subset of the tags the agent placed on the evidence he deemed particularly relevant. (*Id*. at 7.) These exhibits, however, were nothing more than exported selections from the underlying Axiom portable case file which Agent Christensen testified consistently was his expert report and which was properly noticed and made available to the defense well in advance of trial. In overruling his counsel's trial objection to these exhibits, this Court determined that they were not expert reports but were "just exhibits put together to present some of the information that was available" to Eby's expert for almost a year before trial. (Doc. No. 80, at 17.) Specifically, the Court explained to defense counsel that they were:

> just a compilation of information that was contained in the discovery from the extraction, and that these were available to your expert, and your expert could see all of these things. You had all of this information. You could have organized it in any way that you may want to for presentation, and that this isn't really—it's really a misnomer to say it's a report . . . .

(*Id*. at 15.)

The fallacy of Eby's position that the summary exhibits constituted separate expert reports was thrown into stark relief at the motion hearing. There, defense counsel maintained that had Agent Christensen merely limited his testimony to the 86 tags taken from the Axiom portable case file that showed an interest in minor without reliance on the summary exhibits, no Rule 16 violation would have taken place. Of course this is true because an expert is not required to testify to all of the evidence he found relevant to the pending charges and may pick and choose from the evidence identified in his report. The fact that he elects to use summary exhibits containing exports from his report to make it easier for the jury to follow his testimony does not somehow transform these exports into expert reports of their own.

Instead, it was clear from the hearing that one of Mr. Curtin's chief complaint was that the

summary exhibits should have been produced in discovery because they would have provided a more focused organization to the raw data that was produced and would have more clearly defined for the defense the government's trial strategy. "Neither Rule 16, nor the Due Process clause of the Fifth Amendment, requires the government to organize the discovery in a specific way." *United States v. McLeroy*, No. 3:22-cr-68, 2023 WL 5655521, at *2 (E.D. Tenn. Aug. 31, 2023) (citing *United States v. Warshack*, 631 F.3d 266, 296–98 (6th Cir. 2010)). "Even when discovery is voluminous, the government has no duty to isolate the materials or documents that are relevant to each count of an indictment." *Id*. (citing *United States v. Richards*, 659 F.3d 527, 543–45 (6th Cir. 2011)). In *Richards*, the Sixth Circuit held that Rule 16 "does not require the separate identification of the government's case-in-chief evidence[,]" finding that the government was not required to specifically identify "a list of a dozen or so files/images" from among over 20,000 files on the computer that was analyzed. *Id*. at 543. In reaching this conclusion, the court noted that there was no evidence that the government had acted in bad faith and "attempted to obfuscate the relevant documents by burying them without direction under an avalanche of irrelevant materials." *Id*. at 545 (citation omitted). "Quite to the contrary," the trial court ordered the government to produce an indexed list of the images to defense counsel six weeks before trial. In finding no discovery abuse, the court of appeals underscored that the defendant could have, but did not, request any additional time to review the discovery. *Id*.

Here, as in *Richards*, there is no evidence that the government attempted to bury or hide the information it intended to use at trial, and Eby has not suggested otherwise. Rather, the record establishes that the government was entirely transparent about the materials it provided for review, and even Mr. Curtin agreed that Agent Christensen was extremely accommodating. Further, it is

undisputed that the government gave Mr. Curtin unlimited access to the Axiom portable case file, complete with the information tagged by Agent Christensen (and which eventually formed the basis for exhibits 62 and 63) eleven months prior to trial and placed no time restraints on his access. Indeed, he could have copied the contents of the Axiom portable case file but did not do so. The fact that his expert may have elected to focus his review on other matters cannot be attributed to the government as a discovery violation. Moreover, just as in *Richards*, Eby could have, but did not, request additional time for his expert to review the Axiom portable case file. And even though it did (by tagging certain evidence in the Axiom portable case file for Eby's defense team to see (and copy if they chose to)), the government was not required to pinpoint or highlight portions of discovery or present the discovery to Eby in a way that forecasted precisely how the government intended to use the evidence at trial, and its failure to do so cannot have resulted in a substantial legal error. *See, e.g., United States v. Spivak*, 639 F. Supp. 3d 773, 779 (N.D. Ohio 2022) (finding that the government had substantially complied with its discovery obligations, noting that "[f]ederal law does not . . . require that the United States provide discovery in any specific format in a criminal case").

Eby also complains that the government failed to disclose Exhibits 62 and 63 in advance of trial, as required by the Court's trial order. Just as it does not require the government to pinpoint its discovery, Rule 16 does not require the government to make a pretrial disclosure of its trial exhibits. *See United States v. Prince*, 618 F.3d 551, 562 (6th Cir. 2010). Eby correctly observes, however, that the Court's trial order directed the parties to exchange proposed trial exhibits by January 10, 2024, twelve days before the start of trial. (*See* Case No. 1:20-cr-186, Doc. No. 217 (Amended Trial Order), at 1.) While not mandated by any rule, the Court requires parties to

exchange exhibits in advance of trial in order to identify potential evidentiary issues early so as to avoid delays during trial. The parties engaged in a timely exchange of the bulk of the exhibits in accordance with the trial order, but it appears that Exhibits 62 and 63 may not have been included in this pretrial exchange and were not produced until the morning of January 22, 2024, the first day of trial.[13]  (Doc. No. 87, at 8.)

Eby has failed to demonstrate that he suffered prejudice from the twelve-day delay in the production of these demonstrative exhibits. All of the information contained in Exhibits 62 and 63 was made available to defense counsel and his expert well before trial,[14] and the exhibits in question were not introduced until the government's final witness—Agent Christensen—testified on January 24, 2024 and January 25, 2024. Under these circumstances, Eby cannot establish that he was prejudiced to the extent that a substantial legal error occurred warranting a new trial.[15] *See generally United States v. Peck*, 62 F. App'x 561, 566 (6th Cir. 2003) (defendant could not demonstrate prejudice when he received summary exhibits only two days before trial containing

---

[13] At trial, the government's counsel could not recall whether Exhibits 62 and 63 were among the exhibits exchanged prior to trial. (Doc. No. 80, at 6.) The government now confirms that these particular exhibits were not included on the flash drive that was produced before trial. (Doc. No. 90, at 14 ("Upon further reflection, the government believes that it did not provide demonstrative government exhibits 62 and 63 until January 22, 2024.").)

[14] Because Mr. Curtin only downloaded the Discovery USB File before he left the FBI field office, the only portable case file he had in his lab was the IEF portable case file. While there may have been some overlap between the tags that appeared in the IEF and Axiom portable case files, Mr. Curtin testified that the 8 tags in Ex. 62 and the 78 tags in Ex. 63 that were exported from the Axiom portable case into the summary exhibits were not in the IEF portable case file and could not, therefore, be viewed using IEF. Even if this is true, the record is clear that Mr. Curtin was given unlimited access to the Axiom portable case file and could have even downloaded it and taken it with him. Instead, he elected to not even look at the file while he was at the field office, let alone inquire as to whether he could download it. Mr. Curtin explained his strategic reasons for focusing his review in a particular way, but these reasons cannot be charged against the government as a discovery violation.

[15] During the hearing, defense counsel and Mr. Curtin made much of the fact that Mr. Curtin was not "given" or "presented with" the Axiom portable case file. Mr. Curtin eventually conceded, however, that he was not *given* any files. Instead, Agent Christensen made all of the materials available for copying. The only restriction made on his ability to download materials was that he could not remove contraband from the FBI filed office. Again, Mr. Curtin chose which files to download, and did not even inquire about copying the Axiom portable case file. His attempt to suggest that the government somehow is at fault for not proactively suggesting he copy this file falls flat.

information to which he previously had access).

**B. The Court did not Usurp the Jury's Fact-Finding Role**

According to Eby, the Court committed prejudicial error when it instructed the jury—in response to their question regarding whether any of the images or videos found on Eby's computer were of the minor victims—that "there was no evidence on Eby's computer (Exs. 44 and 51), that the images were or were not the minor victims." (Doc. No. 87, at 8; Doc. No. 72, at 2.) Citing *United States v. Harvey*, 653 F.3d 388, 398 (6th Cir. 2011), Eby now argues (incredibly) that "[t]he Court should have instructed the jury to rely on their own recollection of the evidence presented at trial." (Doc. No. 87, at 10 (citing *Harvey, supra* (explaining that such a response by a court is often preferable when the jury question is phrased in general terms, involves disputed facts, or relates to a credibility determination)).) Yet, Eby admits that this is the exact instruction the Court proposed giving. (Doc. No. 88, at 1.) Eby objected to this instruction—not once but thrice—first after the Court initially proposed it, a second time after the government lodged an objection to defense counsel's alternatively suggested response, and a third time when the Court proposed the two final options to counsel. (*Id.*) Had the Court erred in instructing the jury, it would have been at Eby's repeated invitation. *See United States v. Barrow*, 118 F.3d 482, 490 (6th Cir. 1997) (discussing error that the party "himself invited or provoked the court or the opposite party to make").

The Court, however, did not err in instructing the jury. There is no dispute that the images produced at trial did not show the subjects' faces. (Doc. No. 81, at 11; *see* Doc. No. 88, at 1.) After rejecting the Court's proposed instruction to rely on their collective recollections, defense counsel requested that the jury be instructed that there was no evidence that the images found on the

computer were of the minor victims. (Doc. No. 88, at 1.) Upon the government's objection, the Court explained that it could not give the requested instruction because, "I think no one can definitively tell because they're not pictures of their faces. They're pictures of other portions of their bodies." (Doc. No. 81, at 11.) Indeed, had the Court given defendant's requested instruction, it would likely have invaded the jury's fact-finding role by advocating for a particular interpretation of the evidence; namely, that the images were definitively not those of the minor victims. *See United States v. Miller*, 738 F.3d 361, 384 (D.D.C. 2013) (trial court erred by endorsing jury's preliminary interpretation of the evidence encapsulated in its question to the court (citing *Harvey*, 653 F.3d at 398)); *see also Quercia v. United States*, 289 U.S. 466, 470–71, 53 S. Ct. 698, 77 L. Ed. 1321 (1933) (noting that the while a judge may comment on the evidence to the jury, he may not act as a witness, distort the evidence, usurp the jury's role, or express hostility towards either side).

Rather, consistent with the trial evidence, the Court elected to instruct the jury that there was no evidence either way as to whether the images were those of the minor victims. As the Court explained to counsel in a conference held out of the hearing of the jury:

> And that's where I believe my response strikes the even-handed balance of handling this question because we don't know if they were or they weren't [images of the minor victims]. And there was no testimony that they were or they weren't because of the nature, the limiting nature, of the specifics of the images.

(Doc. No. 81, at 14.) In instructing the jury as it did, the Court was able to respond to the jury's question without distorting the record or usurping the jury's legitimate fact-finding role by directing them to a particular factual determination. *See, e.g., United States v. Infante*, 404 F.3d 376, 389 (5th Cir. 2005) (trial court did not err in responding to jury question as to whether the vehicle defendant was driving when he received a traffic ticket was the same vehicle in which his

co-defendant was arrested by advising the jury that "[t]here is no evidence either way"). Eby fails to explain how this neutral instruction prejudiced him in such a way that his substantial rights were affected.[16] It, therefore, provides no basis for granting a new trial.

## IV.     CONCLUSION

The Court finds that defendant's alleged errors, considered separately or cumulatively, did not result in any substantial legal error, and therefore the interest of justice does not necessitate a new trial. Accordingly, defendant's amended Rule 33 motion is denied.

**IT IS SO ORDERED**.

Dated: July 30, 2024

_____
**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[16] Eby suggests that the Court's instruction impermissibly shifted the burden of proof to the defense. (Doc. No. 87, at 10.) If this were the case, the jury would have been expected to return a guilty verdict on Count 2, charging substantive sexual exploitation of children and the only count to refer to a particular minor victim (MV-4). (*See* Doc. No. 1, at 3–4.)  Instead, the jury found Eby not guilty of this charge. (Doc. No. 71, at 2.)

22